**Alf KEY et al., Plaintiffs–Appellants,**

v.

**Mrs. Louise P. WISE et al.,
Defendants–Appellees.**

**No. 77–2986.**

United States Court of Appeals,
Fifth Circuit.

Nov. 5, 1980.

Rehearing and Rehearing En Banc
Denied Dec. 8, 1980.

C. M. Murphy, Memphis, Tenn., for plaintiffs–appellants.

Walter R. Bridgforth, Yazoo City, Miss., Vardaman S. Dunn, Jackson, Miss., H. M. Ray, U. S. Atty., Oxford, Miss., Falton Mason, Jr., Asst. U. S. Atty., James W. Moorman, Asst. Atty. Gen., Dept. of Justice, Carl Strass, Atty., Appellate Sec., Dirk D. Snell, Washington, D. C., Raymond N. Zagone, Nancy B. Firestone, Dept. of Justice, Land & Natural Resources Div., Washington, D. C., for defendants–appellees.

Before BROWN, HILL and RANDALL, Circuit Judges.

RANDALL, Circuit Judge:

This case involves title to 451 acres of land located in Humphreys County, Mississippi. Known to residents of the area as "The Point," the property is bounded on the east by Tchula Lake, a long and narrow body of water, and on the south by a meander in the Yazoo River. Appellants are descendants of Alf Key and Carrie Cook Key, who first entered into possession of the land in 1886. In February of that year, Alf Key purchased a part of the land now in dispute from Henry Powell for $1,000, and recorded the deed. In October 1912, he purchased the remainder of the disputed land from Annie Swisher for $3,000, also recording the deed. Members of the Key family occupied and farmed the land continuously until the 1969 crop was in. Alf and Carrie Cook Key had five children, all of whom were born and raised on the property. After Alf Key died in 1924, his property passed by intestate succession to his five children and his wife. One of his sons, Tom Key, remained on and farmed the property through 1969.

Beginning about 1890, certain ancestors of Appellees (the Wises), known on this record as the "Wise Brothers," began lending "furnish money" to the Keys, taking deeds of trust on the property as security. Furnish money is money used to buy seed and other farm supplies at the beginning of each farming season, and it is normally repaid out of the proceeds of the season's crop. The deeds of trust apparently secured other obligations of the Keys to the Wises in addition to the annual furnish, although the nature of those obligations does not appear from the record.

In 1932, the property was sold for delinquent taxes to an employee and relative of the Wise Brothers, who took title in 1934 and immediately reconveyed the property to the Wise Brothers. The conveyance was recorded, but the Mississippi courts apparently viewed the tax sale and the subsequent conveyances as void, see n.2, infra.

Late in 1969, a terminal illness forced Tom Key to leave the farm and move into town where he could receive care. About this time certain of the Wises executed and recorded deeds purporting to convey some interest in the property to other family members. At about the time of Tom Key's death in 1970, the Wises claimed possession of the land and began renting it to others. After Tom Key died in 1970, several members of the Key family living in Mississippi executed quitclaim deeds conveying whatever interest they had in the property to other Key family members who were non-residents of the state. These deeds were recorded. In July 1972, the Keys filed this action in the United States District Court for the Northern District of Mississippi seeking a declaration of their rights in the disputed land and relying upon diversity jurisdiction. The complaint named as defendants members of the Wise family and the United States. The United States had an interest in the property because in 1961 and again in 1963 it had acquired perpetual easements from the Wises for the purpose of constructing a levee across the property.

Both the Wises and the United States filed motions to dismiss the complaint, challenging the subject matter jurisdiction of the district court. The Wises' motion alleged that complete diversity of the parties was lacking and that the United States had not consented to suits of this nature against it. The United States' motion argued that the United States had not consented to suits against it when the United States claimed a title interest, as opposed to a lien interest, in real property; and that if the action was being brought under the Tucker Act, it was barred by the applicable six-year statute of limitations. Less than a month before a hearing on those motions was held, however, Congress enacted 28 U.S.C. § 2409a and 28 U.S.C. § 1346(f). Act of October 25, 1972, Pub.L.No. 92–562, § 216, 86 Stat. 1176 (amending 28 U.S.C. §§ 1346, 1402 and adding 28 U.S.C. § 2409a). Section 2409a[1] contains a waiver of the

---

1. 28 U.S.C. § 2409a provides, in pertinent part:
   (a) The United States may be named as a party defendant in a civil action under this

section to adjudicate a disputed title to real property in which the United States claims an interest, other than a security interest or

Government's sovereign immunity in suits to quiet title to land in which the United States claims an interest, and section 1346(f) provides: "The district court shall have *exclusive* original jurisdiction of civil actions under Section 2409a to quiet title to an estate or interest in real property in which an interest is claimed by the United States" (emphasis added). The hearing was held on November 21, 1972, at which time the Act of October 25, 1972 was brought to the court's attention, although the complaint was not formally amended to rely thereon at that time. At the conclusion of the hearing, during which a representative of the Government read the new Act to the court over the telephone, the court noted that it had jurisdiction of the case, but abstained because a decision on the merits of the case would involve only state law issues. The court said: "The Court further finds, however, that this action, seeking, as it does, the adjudication of conflicting claims to the ownership of an interest in land, involves no federal questions on its merits but does involve uncertain and complex state land law issues which should be settled by state courts in the particular circumstances of this case and that this Court should abstain from exercising jurisdiction pending the settlement of the state issues in the appropriate state forum and that further proceedings herein should be suspended." Thus, the court did not dismiss the federal case, but retained jurisdiction pending the outcome of a state court suit, not then instituted, that would decide the issues of state property law. The Keys moved in the district court for reconsideration of the order of abstention, formally amending their complaint to rely on the jurisdictional provision of 28 U.S.C. § 1346(f) and the waiver of sovereign immunity in 28 U.S.C. § 2409a. The motion was denied, and the Keys appealed to this court. The appeal was dismissed without opinion.

In the meantime and in accordance with the suggestion of the district court, the Wises brought an action in the Chancery Court of Humphreys County, a Mississippi state court, to cancel as clouds on their asserted title the quitclaim deeds recorded by the Keys in 1970 and to adjudicate the Wises to be the true owners of the property on the basis of adverse possession. The Wises asserted two grounds for their claim to the land. One ground was that Tom Key had never repaid the debt secured by a 1931 deed of trust, which pledged the property and all the livestock, farming implements, and crops owned by Tom Key in that year. The Wises claimed that, as a consequence, their predecessors in title entered the land as "mortgagees in possession after condition broken" in 1932. Thereafter, the Wises contended, the Wise Brothers rented the property to Tom Key and he attorned to them as a tenant on the property. The Wises argued that Tom Key's tenancy was possession of the property for their benefit and adverse to the interest of the Keys (Tom Key and the other Key family members who were cotenants by virtue of Alf Key's intestate death in 1924).

The other ground upon which the Wises based their claim to the property was that they have claimed full right and title to the land since 1934 under a deed from Louis Fischer, an employee of the Wise Brothers partnership and a son of one of the partners at that time. That conveyance came about in the following manner. In 1932 the disputed property was sold to satisfy delinquent taxes at an annual Humphreys County sheriff's tax sale. Mr. Fischer purchased the property at that sale for $143.48. The Keys did not redeem the property by paying the delinquent taxes within two years, as permitted by Mississippi law, and on September 20, 1934 a tax deed was delivered to Mr. Fischer. The following month, Mr.

water rights. This section does not apply to trust or restricted Indian lands, nor does it apply to or affect actions which may be or could have been brought under sections 1346, 1347, 1491, or 2410 of this title, sections

7424, 7425, or 7426 of the Internal Revenue Code of 1954, as amended (26 U.S.C. §§ 7424, 7425, and 7426), or section 208 of the Act of July 10, 1952 (43 U.S.C. § 666).

Fischer conveyed the property to the Wise Brothers for $500. Apparently the tax sale was invalid, however, because of the failure of the President of the Humphreys County Board of Supervisors to sign the minutes of the meeting at which taxes were equalized in Humphreys County in 1931.[2] Nonetheless, the Wises claimed that after 1934, if not before, Tom Key recognized the Wise Brothers as the true owners of the property and occupied and farmed the land thereafter as their tenant with full knowledge of and acquiescence in their claim to ownership.

The case was tried in the state court in June 1973, and on September 12, 1974 the Chancellor filed his formal findings and final decree, awarding title to the Wises.[3] Pending on appeal to the Mississippi Supreme Court, the Keys petitioned this court in May 1976 for a writ of mandamus directing the federal district court to exercise its jurisdiction to hear the federal case. On May 24, 1976 this court denied the petition without opinion. The Keys then petitioned the United States Supreme Court for a writ of certiorari to review this court's denial of their petition for a writ of mandamus. Certiorari was denied without opinion on December 13, 1976. On February 2, 1977, the Mississippi Supreme Court affirmed the decision of the Chancery Court, *Key v. Wise*, 341 So.2d 1326 (Miss.1977). One of the assignments of error made by the Keys in their appeal to the Mississippi Supreme Court was that the Chancery Court was without jurisdiction to hear the case. The Mississippi Supreme Court, however, determined that the Chancery Court did have jurisdiction. The Keys petitioned the Mis-

sissippi Supreme Court for rehearing, which was denied.

Thereafter the Wises sought dismissal of the Keys' federal lawsuit in the district court on the basis of res judicata. The district court granted the motion to dismiss on September 7, 1977. This appeal followed.

## I.  *The Law of the Case Doctrine.*

■ The Keys have already attempted to appeal the abstention order once, without success, and they also sought a writ of mandamus from this court, which similarly challenged the propriety of the abstention. We must therefore consider whether the dismissal of the appeal and the denial of the writ preclude our examination of the propriety and effect of the abstention order. Regarding the doctrine of law of the case, we have said:

> The "law of the case" rule is based on the salutary and sound public policy that litigation should come to an end. It is predicated on the premise that . . . it would be impossible for an appellate court "to perform its duties satisfactorily and efficiently" and expeditiously "if a question, once considered and decided by it were to be litigated anew in the same case upon any and every subsequent appeal" thereof.

*White v. Murtha*, 377 F.2d 428, 431 (5th Cir. 1967). Whether the doctrine applies at all, therefore, depends on whether the question as to which it is asserted was decided previously in the course of litigation. No explanation for either the dismissal of the appeal

---

2. The Keys assert, and the Wises do not contest, that in 1945 the Mississippi Supreme Court's decision in *Gardner v. Price*, 197 Miss. 831, 21 So.2d 1 (1945), rendered the tax sale to Fischer invalid. *Gardner* involved the equalization of taxes in Humphreys County for the year 1930, whereas the delinquent taxes for which the Key property was sold were equalized in 1931. It appears from the record and from the opinion in *Gardner*, however, that the same invalid procedure was employed by the Board of Supervisors, which was responsible for the equalization of taxes, in both years. Although the Chancellor's opinion does not mention the

issue, nor *Gardner*, it is evident that the Chancery Court considered that the tax sale to Fischer did not vest legal title to the property in him, and that therefore his conveyance to the Wises passed no interest to them. Instead, the Chancery Court held that the Wises acquired titled by adverse possession against the Keys. *See also Key v. Wise*, 341 So.2d 1326, 1326–27 (Miss.1977) (affirming Chancellor's determination that the Wises acquired title by adverse possession).

3. The pertinent portions of the Chancellor's opinion are set out in note 10, *infra*.

or the denial of the writ of mandamus was given by the panels that ruled on those applications. Thus, we are not bound by any "law of the case" unless a determination by us concerning the propriety of abstention is necessarily inconsistent with every possible correct basis for the earlier rulings of this court.[4]

■ One obvious basis for the dismissal of the Keys' appeal of the abstention order that is not inconsistent with a determination by us that abstention was improper is that the earlier panel considered the order nonappealable. The abstention order did not terminate the federal case, but held it in abeyance pending the resolution of the yet--to--be--filed state court action. The appealability of such abstention orders remains an unsettled question.[5]

■ The denial of the Keys' petition for a writ of mandamus could also have been predicated on grounds not inconsistent with a determination that abstention was improper. The issuance of an extraordinary writ "is in large part a matter of discretion with the court to which the petition is addressed." *Kerr v. United States Dist. Ct. for N.D. of Cal.*, 426 U.S. 394, 403, 96 S.Ct. 2119, 2124, 48 L.Ed.2d 725 (1976). Although the "traditional use" of the writ of mandamus, as described by Chief Justice Stone, "[is] to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so," *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 26, 63 S.Ct. 938, 941, 87 L.Ed.2d 1185 (1943), even when a jurisdictional error has been committed, review by mandamus is sometimes withheld. One reason for denying mandamus even when the applying party appears to be entitled to an appellate cure is that the "complaining party has an adequate remedy by appeal or otherwise . . . ." *Ex parte Chicago, R.I. & Pac. Ry.*, 255 U.S. 273, 276, 41 S.Ct. 288, 289, 65 L.Ed. 631 (1921). This principle was applied in this circuit in *Belcher v. Grooms*, 406 F.2d 14 (5th Cir. 1968). There petitioners sought a writ of mandamus while an appeal was pending before the Fifth Circuit. The writ was denied, this court saying: "Neither the denial of the writ, nor anything we say in this opinion, is a determination of whether the district court did or did not have jurisdiction, . . . . The correctness of the trial court's rulings on jurisdiction is an issue to be decided in the pending appeal . . . ." 406 F.2d at 17. In this case mandamus was sought while an appeal of the state court decision, including the jurisdictional question, was pending before the Mississippi Supreme Court. Under these circumstances we are loath to assume that the denial of the writ without opinion was a determination on the merits of the claimed jurisdictional error.

■ Finally, it is well settled that the Supreme Court's denial of a petition for certiorari "carries with it no implication whatever regarding the Court's views on the merits of a case which it has declined to review." *Maryland v. Baltimore Radio Show, Inc.*, 338 U.S. 912, 919, 70 S.Ct. 252, 255, 94 L.Ed. 562 (1950) (per Frankfurter, J.).

We therefore conclude that we are not bound by any law of the case on this appeal.

II. *Collateral Attack on the State Court's Jurisdiction.*

■ We have no power to vacate the decision of the Mississippi Supreme Court, which approved the jurisdiction of the Mississippi trial court, for this court has held that "[i]t is not the province of lower federal courts to review the appropriateness of civil decisions of a state's highest court; review of that judgment properly lies by writ of certiorari to the Supreme Court of The United States." *Olivares v. Martin*, 555 F.2d 1192, 1196 (5th Cir. 1977). A review of the state court's jurisdiction, how-

---

4. We would, of course, be bound by decisions of another panel that we considered to be erroneous. Where no explanation for a ruling is given, however, we presume that the ruling was not erroneous, and that presumption defines the boundaries of our law of the case inquiry.

5. *See, e. g.*, Field, *The Abstention Doctrine Today*, 125 U.Pa.L.Rev. 590, 592 (1977).

ever, is one step in our analysis of whether it was proper to accord res judicata effect to that state court judgment in the stayed federal court action.

■ A determination by a state court that it has jurisdiction of the case presented to it is generally conclusive, at least when the jurisdictional question is fully litigated. This principle derives from the full faith and credit clause of the Constitution, U.S. Const. Art. IV, § 1, and is implemented in the federal courts by 28 U.S.C. § 1738. *See Durfee v. Duke,* 375 U.S. 106, 84 S.Ct. 242, 11 L.Ed.2d 186 (1963). In *Durfee* the Court stated the "general rule" that "[a] judgment is entitled to full faith and credit— even as to questions of jurisdiction—when the [second] court's inquiry discloses that those questions have been fully and fairly litigated and finally decided in the court which rendered the original judgment." 375 U.S. at 111, 84 S.Ct. at 245. The court in *Durfee* acknowledged, however, that this general rule of finality of jurisdictional determinations is not without exceptions. The court then stated that "[d]octrines of federal pre–emption or sovereign immunity may in some contexts be controlling," 375 U.S. at 114, 84 S.Ct. at 246, but concluded that "no such overriding considerations," *id.,* were present in *Durfee.* In footnote 12 of the opinion in *Durfee,* the Court noted that the Restatement of Conflict of Laws recognizes the possibility of such exceptions and quoted the following rule from the Restatement:

"Where a court has jurisdiction over the parties and determines that it has jurisdiction over the subject matter, the parties cannot collaterally attack the judgment on the ground that the court did not have jurisdiction over the subject matter, unless the policy underlying the doctrine of res judicata is outweighed by the policy against permitting the court to act beyond its jurisdiction. Among the factors appropriate to be considered in determining that collateral attack should be permitted are that

"(a) the lack of jurisdiction over the subject matter was clear;

"(b) the determination as to jurisdiction depended upon a question of law rather than of fact;

"(c) the court was one of limited and not of general jurisdiction;

"(d) the question of jurisdiction was not actually litigated;

"(e) the policy against the court's acting beyond its jurisdiction is strong." Restatement, Conflict of Laws, § 451(2) (Supp.1948). See Restatement, Judgments, § 10 (1942).

*Id.* at 114 n.12, 84 S.Ct. at 247 n.12.

Although the Court in *Durfee* was not presented with what it termed "overriding considerations" of federal preemption or sovereign immunity and thus did not undertake the analysis described in the Restatement, the Court's footnote 12 suggests that such an analysis would be appropriate when a federal court is presented, as we are here, with a collateral attack on a state court judgment on the ground that the state court did not have jurisdiction over the subject matter by virtue both of a species of federal preemption and of sovereign immunity.

■ We begin that analysis, in parts A and B below, by considering the Keys' two primary challenges to the state court's jurisdiction.[6] In part C, we apply the Restate-

---

6. The Keys argue that there was no jurisdiction in the state court for other reasons, too. Their contentions that discovery was restricted in the state court, that the statute of limitations in § 2409a was not applied in the state court, and that the Chancellor was biased, however, are not challenges to the state court's jurisdiction, but are appropriate considerations in the decision whether to accord res judicata effect to the state court judgment in the federal action.

Accordingly, we deal with those contentions in part III, *infra.*

The other argument made by the Keys does go to the state court's jurisdiction. The Keys argue that the United States was a necessary party to the state court lawsuit, and its absence there defeated the state court's jurisdiction. This contention was presented to the Chancellor and was an assignment of error to the Mississippi Supreme Court. Whether the Unit-

ment factors to both of the claimed grounds of jurisdictional error, and we conclude that the state court's jurisdiction is not open to collateral attack.

### A. Applicability of § 2409a to the State Court Action.

In effect, the state court decided all the issues, and only the issues, that were first presented to the federal court in a case that alleged that the federal court had exclusive jurisdiction to hear it. Both actions were lawsuits to adjudicate title to the same property, and hence both actions involved the same issues of Mississippi property law, but the parties were different. In the federal action, the Keys sued the Wises *and* the United States. The Keys' assertion of ownership of the land was a claim adverse to an interest claimed by the United States, because the United States had acquired its levee easement through the Wises. That claim not only provided the Keys with access to the federal court under the terms of 28 U.S.C. §§ 2409a and 1346(f), but also gave that court exclusive jurisdiction over the entire civil action and not merely over the claim against the United States. When, following the federal court's abstention, the Wises filed suit in the state court,[7] they did not join the United States, for the United States did not claim an interest in the land adverse to them. Although the Keys sought a dismissal of the state court complaint on the ground that the United States was a necessary party to the lawsuit and had not been joined, the Chancellor appar-

ently determined that the United States' interest in the property did not make it a necessary party under Mississippi law. The Keys also sought a dismissal in the state court on the ground that jurisdiction of the case was exclusively in the federal courts. Although § 2409a applies in terms to actions to quiet title to property in which the United States claims an interest, the Chancellor evidently concluded that the action did not come within the statute, and thus that § 1346(f)'s grant of exclusive federal court jurisdiction did not apply. Although the Chancellor did not explain the basis of his ruling, in affirming the Chancellor's jurisdiction the Mississippi Supreme Court noted that "[i]n the present case there is no 'interest claimed by the United States' which is controverted by the Wises and the United States is not a party." *Key v. Wise,* 341 So.2d 1326, 1327 (Miss.1977).

■ The Keys argue that § 2409a applied even to the lawsuit filed by the Wises in the state court. Although the United States would not have appeared there "as a party defendant," *see* 28 U.S.C. § 2409a(a), at least one district court has construed § 2409a to apply to a counterclaim for a confirmation of quiet title asserted by a defendant against the United States as plaintiff in a quiet title action. *United States v. Phillips,* 362 F.Supp. 462 (D.Neb. 1973). We agree that the alignment of the parties is not determinative of the question whether § 2409a applies to a particular claim.

ed States was a necessary party to the state court lawsuit is a question of Mississippi law, and we accept the holding of the highest court of that state that the United States was not a necessary party to the state court lawsuit. Of course, the United States is a party in the federal action.

7. The reversed adversarial posture of the parties was not the coincidental outcome of a race to the state courthouse door, however. Although the district court's abstention order suggested that either party could institute the state court action, the Keys would have risked dismissal of their lawsuit had they instituted the state court action. They could not claim the property against the Wises without simultaneously claiming against the interest conveyed to the United States by the Wises. In so

doing, the Keys would be stating a claim described in 28 U.S.C. § 2409a, and therefore a claim within the exclusive original jurisdiction of the federal court. Because of the rule first announced in *Lambert Run Coal Co. v. Baltimore & Ohio R. Co.,* 258 U.S. 377, 42 S.Ct. 349, 66 L.Ed. 671 (1922), that upon removal a federal court must dismiss a case that falls within its exclusive jurisdiction if the case was first instituted in, and then removed from, a state court, the Keys' hands were effectively tied by the federal court's abstention and by the possibility that the Wises might frustrate their lawsuit by seeking dismissal of a Key·filed state action by way of removal to the federal court. *See, e. g., Bradford v. United States ex rel. Dep't of Interior,* 431 F.Supp. 88 (W.D.Okl.1977).

The Keys, however, did not assert a counterclaim—or, in Mississippi parlance, a cross-bill—in the state court action. They argue convincingly in brief that they did not do so for fear that such a pleading in the state court would be construed as a waiver of their right to return to federal court at the conclusion of the state court lawsuit. The Keys have taken the position throughout the litigation that their quiet title claim against the Wises and the United States can be decided only by a federal court. The Supreme Court has said that although "a party has a right to return to the District Court, after obtaining the authoritative state court construction for which the court abstained, for a final determination of his claim," *NAACP v. Button*, 371 U.S. 415, 427, 83 S.Ct. 328, 335, 9 L.Ed.2d 405 (1963), that right can be waived if the litigant submits his entire case unreservedly to the state court following abstention. *England v. Louisiana Board of Medical Examiners*, 375 U.S. 411, 419, 84 S.Ct. 461, 471, 11 L.Ed.2d 440 (1964). It is for this reason, the Keys assert, that they did not ask the state court to quiet title in them, but only defended against the claim of the Wises.

Because the Wises claimed the land by adverse possession against the record title of the Keys, however, a decision in the state court adverse to the Wises would also be adverse to the United States, for the United States claims its easement interest through the Wises. For the same reason, a decision in the state court in favor of the Wises would also be in favor of the United States. Whichever way the title question was resolved in the state court, therefore, the lawsuit involved an adjudication of "a disputed title to real property in which the United States claims an interest." The Keys assert that the policy of § 2409a and § 1346(f) with regard to that adjudication of title is clear: such cases should be heard exclusively in federal courts. *See California v. Arizona*, 440 U.S. 59, 66–67, 99 S.Ct. 919, 924, 59 L.Ed.2d 144 (1979).

On the other hand, in addition to § 2409a(a)'s "party defendant" language, § 2409a(d) provides that jurisdiction of a § 2409a action under § 1346(f) shall cease if,

before the actual beginning of the trial, the Government "disclaims all interest in the real property or interest therein *adverse to the plaintiff*" and that disclaimer is confirmed by order of the district court. 28 U.S.C. § 2409a(d) (emphasis added). This provision suggests that if the lawsuit appeared in the federal court in the posture it assumed in the state court, it would have been dismissed for lack of jurisdiction either because the Government controverted no claim to the land by a party plaintiff or because it controverted no *affirmative* claim to the land by any party. We must bear in mind, however, the Keys' argument that they sought no affirmative relief in the state court because of the rule in *England, supra*.

In any event, the Wises argue that since the question of the applicability of § 2409a to the state court lawsuit was presented to the state court, the state court's decision that § 2409a did not apply is now res judicata. Of course, federal courts are not bound by state court decisions on matters of federal law. *See Sola Electric Co. v. Jefferson Electric Co.*, 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165 (1942); *Standard Oil Co. v. Johnson*, 316 U.S. 481, 62 S.Ct. 1168, 86 L.Ed. 1611 (1942); *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942); *Tipton v. Atchison, T. & S. F. R. Co.*, 298 U.S. 141, 56 S.Ct. 715, 80 L.Ed. 1091 (1936). Because our review of the state court proceedings is collateral rather than direct, however, the question for us is not simply whether the state court could properly take jurisdiction of the lawsuit, which is the federal law question involved, but the much more circumscribed inquiry whether the state court's assumption of jurisdiction is open to collateral attack. We interpret the Supreme Court's opinion in *Durfee v. Duke*, 375 U.S. 106, 84 S.Ct. 242, 11 L.Ed.2d 186 (1963), to mean that even when the claimed jurisdictional error is predicated upon a state court construction of federal law, as it was in *Kalb v. Feurstein*, 308 U.S. 433, 60 S.Ct. 343, 84 L.Ed. 370 (1940), the inquiry on collateral attack should still be guided by

the factors listed in the Restatement, quoted above. *See Durfee v. Duke,* 375 U.S. at 114 n. 12, 84 S.Ct. at 247 n. 12.

B. *The District Court's Power to Abstain.*

The Keys also argue that even if § 2409a did not apply to the lawsuit filed in the state court, the state court was without jurisdiction to render a judgment in the case because the federal district court was powerless to abstain in the face of § 1346(f)'s express grant of exclusive jurisdiction. The Keys' brief poses this question: "May a District Judge [abstain] in a case, the jurisdiction of which is exclusively in the District Court?" Although the full implications of this question are not spelled out in the brief, we believe the question is significant.

▮ The state court action was filed after the district court had assumed jurisdiction of the case. Both the state court and the federal court actions were actions in rem concerning the same res.[8] A court's otherwise valid power to take jurisdiction of an in rem action is qualified by the rule that when a court of competent jurisdiction has obtained possession, custody, or control of the disputed res in an in rem action, that possession cannot be disturbed by any other court. *See, e. g., Mandeville v. Canterbury,* 318 U.S. 47, 63 S.Ct. 472, 87 L.Ed. 605 (1943); *Toucey v. New York Life Ins. Co.,* 314 U.S. 118, 62 S.Ct. 139, 86 L.Ed. 100 (1941); *Princess Lida of Thurn & Taxis v. Thompson,* 305 U.S. 456, 59 S.Ct. 275, 83 L.Ed. 285 (1939); *see generally* C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure,* § 3631 n. 15 (citing cases). The assumption of jurisdiction over an action in rem establishes a bar to any other action in rem or quasi in rem respecting the same

property until the first court's jurisdiction is properly terminated. Moreover, "[t]he rule has been declared to be of especial importance in its application to Federal and state courts." *Farmers Loan & Trust Co. v. Lake St. Elevated R. Co.,* 177 U.S. 51, 61, 20 S.Ct. 564, 568, 44 L.Ed. 667 (1900).

In this case the federal court was the first court to assume jurisdiction of the res in dispute, thereby activating the bar of exclusive in rem jurisdiction. So long as the federal court maintained its hold on the res, the Mississippi courts could not obtain jurisdiction to act in rem with respect to that res. Ordinarily, however, nothing would prevent the federal court from terminating its hold on the res, for example by dismissal, or from transferring jurisdiction of the res to the state court, for example by abstention, *see, e. g., Colorado River Water Cons. Dist. v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). When Congress has directed, however, not only that the federal courts may take jurisdiction of a particular class of cases, but also that they have *exclusive* jurisdiction of those cases, abstention to permit adjudication of the entire case in a state forum defeats the purpose of that legislation.

▮ Abstention in this case was clearly improper, even leaving to one side the exclusive character of the federal court's jurisdiction. The basis for the district court's abstention was that the case involved "uncertain and complex state land law issues." Although the relevant Mississippi property law may have been difficult to ascertain, it was in no sense unsettled, and the Supreme Court has said that "the mere difficulty in ascertaining local law is no excuse for remitting the parties to a state tribunal for the start of another lawsuit." *Lehman Brothers v. Schein,* 416 U.S. 386, 390, 94

---

8. The Mississippi Supreme Court characterized the state court lawsuit as an action to remove certain clouds on the Wises' title. *Key v. Wise,* 341 So.2d 1326, 1327 (Miss.1977). The relief sought by the Wises, the relief granted by the Chancery Court, and the relief affirmed by the Mississippi Supreme Court, however, not only cancelled the asserted clouds on the title, but also adjudicated the Wises to be the true own-

ers of the land on a basis of adverse possession. The judgment included a decree setting out in detail the ownership interests of the various triumphant parties. The state court lawsuit thus involved a disposition of the property. Under Mississippi law, that action was in rem. *See Ravesies v. Martin,* 190 Miss. 92, 199 So. 282, 285 (1940).

S.Ct. 1741, 1744, 40 L.Ed.2d 215 (1974); *see also Meredith v. City of Winter Haven*, 320 U.S. 228, 234–35, 64 S.Ct. 7, 10–11, 88 L.Ed. 9 (1943); *accord, Sayers v. Forsyth Building Corp.*, 417 F.2d 65, 72–74 (5th Cir. 1969); *Howell v. Union Producing Co.*, 392 F.2d 95, 98 (5th Cir. 1968).

The question remains, however, whether the improper abstention affected the jurisdiction of the state court. If it was beyond the district court's *power* to decline to exercise the jurisdiction Congress conferred exclusively on it, then the abstention order would be invalid as a judicial act going beyond the court's jurisdiction. It would seem to follow from that proposition that the abstention, if invalid, would not operate to lift the bar of exclusive in rem jurisdiction, and consequently that the state court could not properly take jurisdiction of the case. On the other hand, if the district court had the power to abstain despite its exclusive jurisdiction, then, even if improper, the abstention was a valid judicial act.

In a recent opinion, the Supreme Court implied that the question whether a federal court has the power to decline to exercise exclusive jurisdiction, in order to permit the institution of state court proceedings to resolve the merits of the issues within that exclusive jurisdiction, is an open one. In *Will v. Calvert Fire Ins. Co.*, 437 U.S. 655, 98 S.Ct. 2552, 57 L.Ed.2d 504 (1978), the Court said:

> Calvert contends that a district court is without power to stay proceedings, in deference to a contemporaneous state action, where the federal courts have exclusive jurisdiction over the issue presented. *Whether or not this is so*, petitioner has not purported to stay consideration of Calvert's claim for damages under the Securities Exchange Act of 1934, which is the *only* issue which may not be concurrently resolved by both courts.

*Id.* at 666, 98 S.Ct. at 2559. (footnote omitted) (first emphasis added).

### C. *Application of the* Restatement *Factors.*

The legal questions on which the jurisdiction of the Mississippi court ultimately de-

pended in this case–whether § 2409a applied to the state court action and whether the district court had the power to abstain—are both unsettled, and we express no view on how either question should be resolved. All we decide on this appeal regarding the jurisdiction of the Mississippi courts is the threshold question whether collateral attack is permissible in the federal court action.

�these In this case, our application of the factors enumerated in the Restatement of Judgments leads us to conclude that the Mississippi courts' jurisdictional determination is conclusive. Although the Mississippi Chancery Court is a court of limited jurisdiction, the lawsuit to adjudicate title to the property at issue belongs to one of the classes of cases committed to the jurisdiction of that court by the Mississippi Constitution, Miss.Const., Art. 6, § 159. Moreover, although the determination as to jurisdiction depended upon questions of law rather than of fact, the questions of law we think were at issue are questions to which no definitive answer has been rendered. Therefore, it cannot fairly be said that the alleged lack of jurisdiction over the subject matter was clear. The question of jurisdiction was actually litigated before both the Chancery Court and the Mississippi Supreme Court. These are the factors that counsel against collateral attack on the jurisdiction of the state court.

On the other hand, we think the policy against the Mississippi court acting beyond its jurisdiction in this case is strong. Congress enacted § 1346(f) knowing full well that, with minor exceptions, the law applied in every quiet title action would be the law of a state. Nevertheless, by vesting the exclusive jurisdiction of those actions brought pursuant to § 2409a in the federal courts, Congress unequivocally and, we think, emphatically, intended to withdraw resolution of those questions from the jurisdiction of all state courts. *See California v. Arizona*, 440 U.S. 59, 66–67, 99 S.Ct. 919, 924, 59 L.Ed.2d 144 (1979) ("The congressional purpose was simply to confine jurisdiction to the federal courts and to exclude the courts of the States, . . . .").

We note that in discussing the collateral attack rule the Supreme Court has suggested that actual litigation of the jurisdictional issues in the first forum is particularly significant. *See Durfee v. Duke*, 375 U.S. 106, 114 n. 12, 84 S.Ct. 242, 247 n. 12, 11 L.Ed.2d 186 (1963). We also presume, since permissible collateral attack is the exception rather than the rule, that unless the jurisdictional error is palpable, doubts should be resolved in favor of finality. We therefore hold that the judgment of the Mississippi Court as to jurisdiction is not subject to collateral attack on this appeal.

III. *Res Judicata Effect of Valid State Court Judgment.*

Discussing the "preclusion" doctrines of res judicata and collateral estoppel in a recent case, the Supreme Court observed:

A fundamental precept of common–law adjudication, embodied in the related doctrines of collateral estoppel and res judicata, is that a "right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction ... cannot be disputed in a subsequent suit between the same parties or their privies ...." *Southern Pacific R. Co. v. United States*, 168 U.S. 1, 48–49 [18 S.Ct. 18, 27, 42 L.Ed. 355] (1897) .... Application of both doctrines is central to the purpose for which civil courts have been established, the conclusive resolution of disputes within their jurisdictions. *Southern Pacific R. Co.*, supra, at 49 [18 S.Ct. at 27]; *Hart Steel Co. v. Railroad Supply Co.*, 244 U.S. 294, 299 [37 S.Ct. 506, 507, 61 L.Ed. 1148] (1917). To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions.

*Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979) (footnote omitted). The Court went on to note, however, that "special circumstances [may] warrant an exception to the normal rules of preclusion." *Id.* at 155, 99 S.Ct. at 975. The Court noted that special circumstances were presented by a case like *England v. Louisiana Board of Medical Examiners*, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964), in which a litigant who had "properly invoked the jurisdiction of a Federal District Court to consider federal constitutional claims" was then "compelled, without his consent ..., to accept a state court's determination of these claims." 375 U.S. at 415, 84 S.Ct. at 464 (footnote omitted), *quoted in Montana*, 440 U.S. at 163, 99 S.Ct. at 978. The *England* Court gave two reasons for preserving the right to a federal adjudication of a constitutional claim. First, the Court noted that a rule that would force a federal plaintiff to repair to a state court, against his will, for a binding adjudication of a claim for which Congress has provided a federal forum "would be at war" with the constitutionally valid expression of congressional purpose–*i. e.*, the decision to open the doors of the federal courthouse–and with the principle that federal courts should give full effect to Congress' jurisdictional commands. 375 U.S. at 415, 84 S.Ct. at 464.

Second, the Court observed that limited federal review of the state court adjudication, consisting of direct review in the Supreme Court by way of certiorari or appeal,

is an inadequate substitute for the initial District Court determination ... to which the litigant is entitled in the federal courts. This is true as to issues of law; it is especially true as to issues of fact. Limiting the litigant to review here would deny him the benefit of a federal trial court's role in constructing a record and making fact findings. How the facts are found will often dictate the decision of federal claims. "It is the typical, not the rare, case in which constitutional claims turn upon the resolution of contested factual issues." *Townsend v. Sain*, 372 U.S. 293 [, 312, 83 S.Ct. 745, 756, 9 L.Ed.2d 770 (1963)]. "There is always in litigation a margin of error, representing error in factfinding * * *." *Speiser v. Randall*, 357 U.S. 513 [, 525, 78 S.Ct. 1332, 1341, 2 L.Ed.2d 1460 (1958)]. Thus

in cases where, but for the application of the abstention doctrine, the primary fact determination would have been by the District Court, a litigant may not be unwillingly deprived of that determination. The possibility of appellate review by this Court of a state court determination may not be substituted, against a party's wishes, for his right to litigate his federal claims fully in the federal courts.

375 U.S. at 416–17, 84 S.Ct. at 465 (footnote omitted).

*England* involved a constitutional claim, as to which federal jurisdiction is original. Although this case involves a claim under state law, jurisdiction to decide it is exclusively federal. Even though we have held that the state court judgment is not open to collateral attack, the preclusive effect of a state court determination on any aspect of a claim within the exclusive jurisdiction of the federal courts is unclear. *See, e. g.,* Note, *Res Judicata: Exclusive Federal Jurisdiction and the Effect of Prior State–Court Determinations,* 53 Va.L.Rev. 1360 (1967). In *Will v. Calvert Fire Insurance Co.,* 437 U.S. 655, 98 S.Ct. 2552, 57 L.Ed.2d 504 (1978), Justice Brennan, writing for the dissent, discussed the question in the following terms.

> To be sure, the preclusive effect of a state court determination of a claim within the exclusive jurisdiction of the federal courts is an unresolved and difficult issue. See generally Note, Res Judicata: Exclusive Federal Jurisdiction and the Effect of Prior State–Court Determinations, 53 Va.L.Rev. 1360 (1967). For myself, I confess to serious doubt that it is ever appropriate to accord res judicata effect to a state–court determination of a claim over which the federal courts have exclusive jurisdiction; for surely state–court determinations should not disable federal courts from ruling de novo on purely legal questions surrounding such federal claims. See *Cotler v. Inter–County Orthopaedic Assn.,* 526 F.2d 537 (CA3 1975); *McGough v. First Arlington National Bank,* 519 F.2d 552 (CA7 1975); *Clark v. Watchie,* 513 F.2d 994 (CA9 1975). As recognized by Judge Learned Hand in

*Lyons v. Westinghouse Electric Co.,* 222 F.2d 184, 189 (CA2 1955), "the grant to the district courts of exclusive jurisdiction over the action . . . should be taken to imply an immunity of their decisions from any prejudgment elsewhere." I recognize that it may make sense, for reasons of fairness and judicial economy, to give collateral–estoppel effect to specific findings of historical facts by a state court's adjudicating an exclusively federal claim raised as a defense, see *Granader v. Public Bank,* 417 F.2d 75 (CA6 1969), but there are reasons why even such a limited preclusive effect should not be given state–court determinations. It is at least arguable that in creating and defining a particular federal claim, Congress assumed that the claim would be litigated only in the context of federal–court procedure–a fair assumption when the claim is within exclusive federal jurisdiction. For example, Congress may have thought the liberal federal discovery procedures crucial to the proper determination of the factual disputes underlying the federal claim.

437 U.S. 674–75, 98 S.Ct. 2563 (Brennan, J., dissenting).

The Supreme Court recently declined to give res judicata effect to a state court judgment in a later bankruptcy proceeding in federal court. At issue in *Brown v. Felsen,* 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979), was the question whether a bankruptcy court could go beyond the judgment and record of a prior state court proceeding (in which Felsen's debt to Brown was reduced to judgment) in determining whether Felsen's debt was dischargeable in bankruptcy. The parties had stipulated to judgment in the Colorado state court proceeding. Under the provisions of § 17 of the Bankruptcy Act, 11 U.S.C.A. § 35, Felsen's debt was not dischargeable if, as Brown sought to show in the bankruptcy proceeding, it was (1) a liability "for obtaining money or property by false pretenses or false representations . . . or for willful and malicious conversion of the property of another," or (2) a debt

"created by [the bankrupt's] fraud, embezzlement, misappropriation, or defalcation while acting as an officer or in any fiduciary capacity." *See* Bankruptcy Act, 11 U.S. C.A. § 35 (repealed effective Oct. 1, 1979, Bankruptcy Reform Act of 1978, Pub.L. 95–598, § 401(a), 92 Stat. 2682). Before 1970, once a debtor was adjudged a bankrupt in a bankruptcy proceeding, determinations of dischargeability under the Bankruptcy Act were left to the state court in which a creditor sued to enforce his prior judgment. "In 1970, however, Congress altered § 17 to require creditors to apply to the bankruptcy court for adjudication of certain dischargeability questions, including those arising under" the provisions quoted above, 99 S.Ct. at 2208.

Under Colorado law, however, Brown could have obtained extraordinary remedies, such as exemplary damages or body execution (imprisonment of the debtor at the creditor's expense), by seeking an adjudication, in the prior state court proceeding, that Felsen's debt was the product of his fraud. Felsen argued that the provisions of § 17 relied on by Brown essentially concerned fraud, and that since Brown did not obtain a stipulation concerning fraud in the prior state court proceeding, Brown should be precluded from litigating the question in the bankruptcy court because it was a matter that could have been concluded in the consent judgment. 99 S.Ct. at 2209.

Once a lawsuit reaches a final judgment on the merits, the doctrine of res judicata bars litigation in a second lawsuit on the same cause of action "of all grounds for, or defenses to, recovery that were available to the parties [in the first action], regardless of whether they were asserted or determined in the prior proceeding." *Id.* Res judicata thus generally has a broader preclusive effect than the doctrine of collateral estoppel, which "treats as final only those questions *actually and necessarily* decided in a prior suit." *Id.* at 2213, n.10 (emphasis added). *Brown v. Felsen* considered only the question whether the doctrine of res judicata barred litigation of the dischargeability question in the bankruptcy

court; it did not consider the possible application of collateral estoppel because Felsen did not argue that the state court litigation had "actually and necessarily decided either fraud or any other question against [Brown]." The Court held that res judicata would not bar litigation of the dischargeability question in the bankruptcy court because "neither the interests served by res judicata, the process of orderly adjudication in state courts, nor the policies of the Bankruptcy Act would be well served" by precluding litigation of the issue. *Id.* at 2210.

The Court noted that the Bankruptcy Act was intended to protect the honest debtor, while the doctrine of res judicata shields the honest and dishonest alike. The Court characterized Felsen's bankruptcy petition as a "new defense," albeit an indirect one, to the indebtedness established in the state court proceeding. Since Brown's challenge to dischargeability did not seek to avoid the state court decree, but was instead *predicated* on the debt established in that proceeding, the Court characterized Felsen as the party seeking–by his bankruptcy petition–to upset the repose of a final state court judgment. The Court suggested that the interest furthered by res judicata–by which it apparently meant "confidence in judgments"–would not be promoted by using the doctrine to prevent Brown from establishing that the debt could not be discharged in bankruptcy.

Orderly adjudication in the state courts would not be promoted by the application of res judicata either, the Court continued, because the fraud/extraordinary remedies issue would not usually be raised in the state court proceeding. Presumably, Brown wanted to establish his right to payment by Felsen in the state court, which he did. The Court considered that Brown had little or no incentive to take the litigation further because (1) Felsen's bankruptcy petition was not on the horizon, so Brown had no reason to apprehend that establishing fraud was a necessary milepost on the road to payment; and (2) the extraordinary remedies available under Colorado law theoretically *reduced* the likelihood that the debt

itself would be paid: exemplary damages might trigger bankruptcy and therefore impair Felsen's ability to pay the debt, and body execution could disable the debtor from earning the funds to pay the debt. In the "ordinary collection proceeding," then, "considerations material to discharge are irrelevant." *Id.* at 2211. Additionally, since one purpose of Congress' decision to eliminate "post–bankruptcy state–court collections suits as a means of resolving certain ... dischargeability questions" was to permit bankruptcy courts to develop expertise in handling them, a rule that would force a creditor to litigate the dischargeability issue, or a similar state law issue, in the state court merely to protect himself in the event of a later bankruptcy petition by the debtor would force the state courts to assume a burden they would not normally have to shoulder. That is, since the Court assumed that the issue of dischargeability or a similar state law question would not normally be litigated in the state court collection proceeding, res judicata would in this kind of case occasion *more* interference with state court adjudication by encouraging litigation of issues the state court would not normally encounter and with which the state court would be unfamiliar.

Finally, the Court said that the federal statutory policy was to permit bankruptcy courts to make an accurate determination regarding dischargeability. The Bankruptcy Act was not intended to shield debtors from liability for debts "growing out of offenses to good morals," *id.* at 2212–13 (*quoting* H.R.Rep. No. 1698, 57th Cong., 1st Sess., p. 6 (1902)), a policy the Court considered fundamental to the statute. Applying the doctrine of res judicata would prevent the bankruptcy court from resolving a question of federal law, *i.e.*, dischargeability, that was central to the proper application of the federal statute.

Of the three factors the *Brown* Court said militated against applying res judicata in that case—the interest served by res judicata, the orderly process of adjudication in state courts, and the policies of the federal statute involved—only the last provides an arguable basis for denying res judicata ef-

fect to the state court judgment in this case. The interests served by res judicata, such as fostering confidence in judgments, conserving judicial resources, and saving prevailing parties the expense and vexation of multiple litigation, *see Montana v. United States*, 440 U.S. at 153, 99 S.Ct. at 973, are promoted by the application of the doctrine to this case. Unlike the situation in *Brown v. Felsen*, in this case the doctrine is not invoked in a effort to shield the losing party from the consequences of what was actually decided in the first litigation; instead, its application is invoked to prevent *re* litigation of the issues actually decided. Furthermore, application of the doctrine in this case will not affect the orderly process of the state court adjudication. Although it is true that this specific case ought not to have reached the state court by way of abstention, a rule prohibiting relitigation of the issues actually determined there will not force state courts to adjudicate claims they would not otherwise hear. Of the factors considered by the *Brown* Court, then, only the question of the federal statutory policy informing Congress' grant of exclusive jurisdiction to federal courts over § 2409a actions remains to be considered.

This case presents an unusual instance of exclusive federal jurisdiction, in that it provides federal courts with exclusive jurisdiction to decide questions of state law. Most other instances of exclusive federal jurisdiction concern controversies whose resolution will ordinarily be governed by the application of federal law. *See generally* 13 C. Wright & A. Miller, *Federal Practice and Procedure* § 3527, pp. 121–22 (1975); *but see* 28 U.S.C. § 1351 (actions against consuls and vice consuls in exclusive jurisdiction of federal courts). Some of the reasons advanced for denying res judicata effect to state court determinations of matters within the exclusive jurisdiction of the federal courts have little force in the context of this case because little federal law is involved. For example, the federal courts' experience in adjudicating federal claims, and the general interest in uniform and

effective application of federal law, *see Lyons v. Westinghouse Elec. Corp.*, 222 F.2d 184, 189 (2d Cir.), *cert. denied*, 350 U.S. 825, 76 S.Ct. 52, 100 L.Ed. 737 (1955), are not reasons to insist on relitigation of this controversy, because the controversy is governed by state, not federal, substantive law.[9]

A greater familiarity with, and expertise in the application of, federal law is not the only difference between a federal and a state forum. Specific fact findings and legal conclusions are required of federal trial courts, and are essential to meaningful review by an appellate court. *See, e. g., Complaint of Ithaca Corp.*, 582 F.2d 3, 4 (5th Cir. 1978). The findings and conclusions of the state trial court in this case would not pass muster in the federal system.[10] Since we are not called upon to review the findings of the state court on the merits, however, the absence of an opinion setting out clearly the historical facts found and the law relied upon presents no great problem when the ultimate legal conclusion—that the land belongs to the Wises

9. Federal law, however, governs some aspects of a quiet title action brought pursuant to § 2409a. Specifically, the point at which a § 2409a cause of action accrues, and the time within which the action must be brought after accrual, are established in 28 U.S.C. § 2409a(f). Neither provision would have affected this lawsuit.

10. A reading of the Chancellor's formal findings does not elucidate the basis of his decision. The full extent of the Chancellor's findings of fact and conclusions of law on the central question of adverse possession by the Wises is contained in the following excerpt from the Chancellor's memorandum opinion:

> I find as a fact that the parties complainant, through and by their predecessors in title, entered said lands in controversy with good and sufficient color of title and have there remained from the year 1932, thence hitherto, which occupancy has been and is hostile, actual, open, notorious, and exclusive to all others.
>
> I find as a fact that none of the several other defenses raised by the answer; outright fraud, concealed fraud, fiduciary relationship, including but not limited to the charging of "excessive, illegal and usurious interest," can prevail to toll the statute. This Court here makes this above disposition of these issues in the heighth of charity.
>
> . . . .
>
> I find as a fact that the last issue involved herein as going to the merits, to–wit, the effect of the mortgage of February 5, 1931, given by only Carrie Cook Key, Roscoe Key, and Thomas Key, must be resolved against the defendants for the reason that the entry above, constitutes a sufficient ouster of Georgia Key Bolden, Alfred Key Herman and Carrie Key Johnson, and their successors, notwithstanding the erroneous conclusion of law pled by defendants concerning the effect of said deed of trust and the quantum of interest therein conveyed.
>
> In short, I find as a fact that complainants have prevailed by that necessary degree of

the credible evidence in the establishment of the allegations of their original bill.

From the Chancellor's opinion it is not clear what acts constituted entry on the property under color of title in 1932. The evidence is uncontroverted that none but the Keys lived on the property until 1970. The Chancellor apparently concluded, however, that although Tom Key's occupancy of the property was undisturbed until the end of the 1969 crop year, in 1932 he became a tenant on the property and attorned thereafter to the Wise Brothers.

There is evidence in the record that supports the conclusion that in the two or three decades preceding the filing of the Key's federal lawsuit in 1972, Tom Key considered himself a tenant of the Wise Brothers.

What is not clear from the opinion or the record is how the Wises acquired color of title in 1932. The Mississippi Supreme Court's opinion, *Key v. Wise*, 341 So.2d 1326, 1327 (Miss.1977), suggested that this case involved issues "substantially similar" to those involved in *Nichols v. Gaddis & McLaurin, Inc.*, 222 Miss. 207, 75 So.2d 625, 78 So.2d 471 (1954), and that the evidence justified a factual conclusion that the elements of adverse possession under color of title enumerated in *Quates v. Griffin*, 239 So.2d 803 (Miss.1970), were satisfied. Having read both cases, as well as the cases upon which those cases in turn rely, we still cannot tell what the Chancellor believed happened in 1932. Neither the Mississippi Supreme Court's opinion nor that of the Chancellor make or refer to any findings of specific historical facts. Moreover, although the Mississippi Supreme Court cites two cases, the Chancellor's cites none; and the two citations in the Mississippi Supreme Court's opinion are of little help in determining what law was applied in concluding that the Wises had obtained title by adverse possession under color of title. To borrow a phrase from one of Britain's famous statesmen, the decision in this case remains very much "an enigma cloaked in a mystery." The ultimate ruling, however, is clear: the property belongs to the Wises.

—is clear, and is a conclusion based entirely on state law.[11]

Another difference between a federal forum and a state forum is that federal discovery rules are generally more liberal than are their state counterparts. This difference may be particularly significant in the context of a § 2409a claim, because disputes about title generally turn more on factual questions than on legal ones; the court's attention will usually focus more on determining who did what, and when, than on nice questions of the legal significance of those events. In this context, Justice Brennan's observation in *Calvert* that, in conferring exclusive jurisdiction on the federal courts, Congress may have assumed that the claim would have been litigated only in the context of federal court procedures, is particularly relevant. Where, as here, the ultimate resolution of the controversy depends primarily on the court's fact–finding function, an allegation that a party's proof has been impeded by discovery rules less liberal than those available in the federal system must be considered very carefully. Given the adversarial nature of our judicial process, the reliability of a court's factual

determinations is obviously dependent upon all parties' access to all the extant relevant information. We think it would be unwise in a case of this nature to accord res judicata effect to a state court judgment when restrictions on discovery cast into significant doubt the reliability of the state court's factual determinations. We note, however, that at an earlier stage in this case the Keys moved to have the federal court decide the case on the record adduced in the state court. While we do not consider that motion to have waived any of their rights, we think it suggests that the Keys considered that the necessary underlying facts were adequately adduced in the state court proceeding, and that their quarrel is with the state court's resolution of the factual and legal issues put in dispute by that evidence.

Giving the state court judgment res judicata effect in this case deprives the Keys of their chosen forum and compels them, without their consent, to accept the state court's determination of their claim. *Montana v. U. S., supra,* characterized that possibility as a "special circumstance" warranting an exception to the normal rules of preclusion

---

11. A different result would probably obtain if the state court's ultimate legal conclusion required it to construe and apply federal law that formed the basis of an exclusively federal claim. In such a case, the inability of the federal court to distinguish the state court's underlying factual findings and legal conclusions from its overall disposition of the case might be a reason to deny the state court judgment preclusive effect in the federal action.

In *Lyons v. Westinghouse Elec. Corp.,* 222 F.2d 184 (2d Cir.), *cert. denied,* 350 U.S. 825, 76 S.Ct. 52, 100 L.Ed. 737 (1955), Judge Learned Hand suggested that when a state court judgment is urged as a bar in a later federal action on an exclusively federal claim, the proper rule is that res judicata applies to the state court findings "of the constituent facts that together make up a claim," but not to the state court's ultimate resolution of the claim based upon those facts. *Id.* at 188. Similarly, Justice Brennan's dissent in *Will v. Calvert Fire Ins. Co.,* 437 U.S. 655, 98 S.Ct. 2552, 57 L.Ed.2d 504 (1978), suggests that although "it may make sense, for reasons of fairness and judicial economy, to give collateral–estoppel effect to specific findings of historical facts by a [state court]," nevertheless, the "state court determination should not disable federal courts from

ruling de novo on purely legal questions surrounding . . . federal claims." *Id.* at 674–75, 98 S.Ct. at 2564. *See also Brown v. Felsen,* 99 S.Ct. 2205, 2213 n.10 ("If, in the course of adjudicating a state law question, a state court should determine factual issues using standards identical to those of [the relevant Federal law], then collateral estoppel, *in the absence of countervailing statutory policy,* would bar relitigation of those issues in the bankruptcy court.").

Both *Lyons* and *Will* involved exclusive federal jurisdiction to adjudicate federal questions. In such cases there is an interest in preserving "an untrammeled jurisdiction of the federal courts," 222 F.2d at 189, to adjudicate questions of federal law that is not present in this case. Specifically, federal courts are not more experienced than Mississippi courts in deciding questions of Mississippi property law; and there is no occasion here for the uniform application of any federal law. To the contrary, state courts are better equipped to resolve this kind of controversy. While that is emphatically not a permissible ground for abstention in a case like this, it is a factor to be considered in deciding whether, once the state court has entered a valid judgment, the judgment should be res judicata in the federal action.

when a constitutional claim is involved. Since a claim under § 2409a, although in the exclusive jurisdiction of the federal courts, presents neither a constitutional nor a federal law issue, the question is simply whether preserving the Keys' access to a federal adjudication of their § 2409a claim is a consideration substantial enough to warrant an exception to the normal rules of preclusion.

In *California v. Arizona*, 440 U.S. 59, 99 S.Ct. 919, 59 L.Ed.2d 144 (1979), the Court noted that the legislative history of 28 U.S.C. § 1346(f) does not illuminate much about Congress' intent in enacting it. The Court concluded that the section's purpose was simply to insure that suits brought against the United States to quiet title to land were heard in a federal court. 440 U.S. at 66–67, 99 S.Ct. at 924. Since § 2409a(d) provides that jurisdiction under § 1346(f) shall cease if the Government disclaims any interest in the property adverse to the plaintiff, it is evident that federal jurisdiction was not provided for the benefit of the private parties to suits to quiet title to land in which the Government claims an interest, but was rather intended to implement a conditional waiver of the Government's sovereign immunity: "Sue me, but sue me in my own courts." *See DuCharme v. Merrill–National Labs.*, 574 F.2d 1307 (5th Cir.), *cert. denied*, 439 U.S. 1002, 99 S.Ct. 612, 58 L.Ed.2d 677 (1978) (affirming on basis of district court opinion) ("When the sovereign waives immunity it may attach any conditions ... to its consent"). In all likelihood, Congress was not sanguine about leaving resolution of title disputes between the Government and a citizen of a state to the citizen's state court. In this case, of course, the Government has not objected to the res judicata dismissal of the Keys' federal action.[12] Given what we perceive to be the purpose of the grant of exclusive jurisdiction of § 2409a suits to the federal courts, we conclude that denying the Keys the benefit of that statutory provision in this case is not a special circumstance that warrants an exception to the normal rules of res judicata.[13]

12. The Government's position on this appeal warrants only brief comment. The Government filed a brief as an Appellee, limiting its argument to the contention that jurisdiction of the Keys' federal action could not be predicated on 28 U.S.C. § 2409a. The Government's position is that, as far as the claim against the United States is concerned, the Keys' lawsuit is one seeking compensation for land taken by the United States. As such, the Government contends, the lawsuit was one that could have been brought under the Tucker Act, 28 U.S.C. § 1346(a)(2) or 28 U.S.C. § 1491, although the six year Tucker Act statute of limitations had run on those claims by the time the federal action was commenced. Since § 2409a(a) provides that "[t]his section does not ... apply to or affect actions which may or could have been brought under sections 1346 ... [or] 1491 ... of this title," the Government suggests that the United States should have been dismissed as a party even before the abstention order was entered, on the ground that the Keys' lawsuit was one that could have been brought under the Tucker Act had the statute not run.

The Government patently misconceives the purpose of § 2409a. The Tucker Act does not provide authority for a district court or the Court of Claims to quiet title to land, which is the relief sought in the instant case; section 2409a does. Moreover, § 2409a(b) provides a Tucker Act–type remedy (compensation) for a prevailing landowner in a § 2409a lawsuit. Finally, § 1346 contains a specific jurisdictional reference to § 2409a. All this suggests that Congress was aware that in § 2409a it was creating a specific quiet title remedy in the federal courts. We think it is obvious that § 2409a was the proper statute under which to bring this lawsuit.

13. While the motion to dismiss on the ground of res judicata was pending, the Keys filed an affidavit in the district court alleging that the Chancellor was biased because one of the attorneys appearing as counsel for the Wises in the Chancery Court was also an attorney for a bank from which the Chancellor had obtained a loan "of several thousands of dollars." The affidavit alleged that the loan was "long overdue" when the Chancellor rendered his opinion in the case and that no legal action to collect the debt was ever contemplated by the bank.

"Redetermination of issues is warranted if there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation." *Montana v. United States*, 440 U.S. 147, 164 n.11, 99 S.Ct. 970, 979 n.11, 59 L.Ed.2d 440 (1978). Whether the affidavit of prejudice casts doubt on the fairness of the state court procedures such that redetermination of the issues in the federal court is appropriate is a question to be judged by federal law standards. Laying aside the question whether this affidavit

Accordingly, we hold that the federal action was properly dismissed on the basis of res judicata.

AFFIRMED.

JOHN R. BROWN, Circuit Judge, dissenting:

Paraphrasing the famous quip of Judge Henry Friendly [1] the extended and scholarly opinion of Judge Randall must be right because it is so wrong. *Gulf Oil Corp. v. Panama Canal Corp.*, 407 F.2d 24, 26 (5th Cir. 1969); *Sands v. Wainwright*, 491 F.2d 417, 431 (5 Cir. 1974) (en banc) (Brown, C. J., concurring); *W. S. Rauch Co. v. Kaiser Steel Corp.*, 388 F.2d 257, 267 (10th Cir. 1967) (Brown, J., dissenting) rev'd 391 U.S. 593, 88 S.Ct. 1753, 20 L.Ed.2d 835 (1968); *Higginbotham v. Ford Motor Co.*, 540 F.2d 762, 775 (Brown, C. J., dissenting) (5 Cir. 1976). Of it may also be said what we stated concerning Judge Sterry Waterman's opinion for us in *United States v. Rochelle, Trustee*, 363 F.2d 225 (5th Cir. 1966). A "painstaking opinion by Judge Waterman—painstaking not only in the careful exploration of every conceivable way to find jurisdiction, but also painstaking in the evident sense of trying to find an escape from a painfully unfortunate result ...." *Lawrence v. United States*, 378 F.2d 452, 467 (5th Cir. 1967).

For my scripture I start with § 1346(f):

The district courts shall have exclusive original jurisdiction of civil actions under section 2409a to quiet title to an estate or interest in real property in which an interest is claimed by the United States.

28 U.S.C.A. § 1346(f).

And for my Golden Text I need go no further than the Court's opinion:

was timely (it was filed four years after the state court trial), *see* 28 U.S.C. § 144, we think the affidavit does not "give fair support to the charge of a bent of mind that may [have] prevent[ed] or impede[d] impartiality of judgment." *Berger v. United States*, 255 U.S. 22, 33 34, 41 S.Ct. 230, 233, 65 L.Ed. 481 (1921). Therefore, we think the allegation of bias does not warrant relitigation of the issues in this case.

In the federal action, the Keys sued the Wises *and* the United States. The Keys' assertion of ownership of the land was a claim adverse to an interest claimed by the United States, because the United States had acquired its levee easement through the Wises. That claim not only provided the Keys with access to the Federal court under the terms of 28 U.S.C.A. §§ 2409a and 1346(f), but also gave that court exclusive jurisdiction over the entire civil action and not merely over the claim against the United States. [629 F.2d 1049, 1057]

First analyzing the case in terms of traditional abstention in *in rem* proceedings the Court states:

Both the state court and the federal court actions were actions in rem concerning the same res. A court's otherwise valid power to take jurisdiction of an in rem action is qualified by the rule that when a court of competent jurisdiction has obtained possession, custody, or control of the disputed res in an in rem action, that possession cannot be disturbed by any other court.

And then adds:

Moreover, "[t]he rule has been declared to be of especial importance in its application to Federal and state courts." *Farmers Loan & Trust Co. v. Lake St. Elevated R. Co.*, 177 U.S. 51, 61, 20 S.Ct. 564, 568, 44 L.Ed. 667 (1900). [629 F.2d 1059].

The court recognizes that in "this case the federal court was the first court to assume jurisdiction of the res in dispute, thereby activating the bar of exclusive in rem jurisdiction." [629 F.2d 1059]

The court sounds once again the decisive significance of specific congressional direction:

1. "The compulsion felt by my brothers, * * * to reach what seems a palpably unjust result reminds me of Chief Justice Erle's observation as to the occasional predilection of the best of judges for 'a strong decision,' to wit, one 'opposed to common sense and to common convenience.' * * *." *Spanos v. Skouras Theatres Corp.*, 364 F.2d 161, 167 (2 Cir., 1966).

When Congress has directed, however, not only that the federal courts may take jurisdiction of a particular class of cases, but also that they have *exclusive* jurisdiction of those cases, abstention to permit adjudication of the entire case in a state forum defeats the purpose of that legislation. [629 F.2d 1059]

Without equivocation the court then reaches the awesome climax: "[A]bstention in this case was clearly improper ...."[2] [629 F.2d 1059]

The court in the analytical juggling process–sometimes, perhaps too often, more euphemistically described as balancing–begins with whether the Federal Court may collaterally review the Mississippi decree of ownership in the Wises. In so doing the Court again ascribes dominant significance to Federal Court exclusivity and the congressional purpose in providing for it:

[W]e think the policy against the Mississippi court acting beyond its jurisdiction in this case is strong. Congress enacted § 1346(f) knowing full well that, with minor exceptions, the law applied in every quiet title action would be the law of a state. Nevertheless, by vesting the exclusive jurisdiction of those actions brought pursuant to § 2409a in the federal courts, Congress unequivocally and, we think, emphatically, intended to withdraw resolution of those questions from the jurisdiction of all state courts. See *California v. Arizona,* 440 U.S. 59, 66–67, 99 S.Ct. 919, 924, 59 L.Ed.2d 144 (1979) ("The congressional purpose was simply to confine jurisdiction to the federal courts and to exclude the courts of the States, ...." [629 F.2d 1060]

Whether the Mississippi decree may or may not be collaterally reviewed by the Federal District Court is in itself not decisive. What, and all that ultimately matters is whether preclusive effect must be given to a Mississippi decree from a Court that ought never have been given the opportunity to adjudicate the case by a Federal Court charged with the statutory obligation to hear, try and determine the controversy to the *exclusion* of all other tribunals.

The Court recognizes, as we all must, that to the high principles of res judicata/collateral estoppel "special circumstances [may] warrant an exception to the normal rules of preclusion." *Montana v. United States,* 440 U.S. 147, 153, 155, 99 S.Ct. 970, 973, 975, 59 L.Ed.2d 210 (1979).

Except that the Federal Court's jurisdiction was invoked by express terms of a statute, not a constitutional claim, our case fits exactly *England v. Louisiana Board of Medical Examiners,* 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964), in which, the majority states, a litigant who had "properly invoked the jurisdiction of a Federal District Court to consider federal constitutional claims" was then "compelled, without his consent ..., to accept a state court's determination of these claims." 375 U.S. at 415, 84 S.Ct. at 464 (footnote omitted), *quoted in Montana,* 440 U.S. at 163, 99 S.Ct. at 978. Quoting at length from *England,* the majority emphasizes the limited effectiveness of appellate corrective action and the high value of fact determination by the Federal Judge. As to this the majority recognizes that "specific fact findings and legal conclusions are required of federal trial courts, and are essential to meaningful review by an appellate court. *See, e.g., Complaint of Ithaca Corp.,* 582 F.2d 3, 4 (5th Cir.1978)," [629 F.2d 1065], but then passes over lightly that the "findings and conclusions of the state trial court in this case would not pass muster in the federal system."[3] [629 F.2d 1065]

The fact that the Keys at one stage may have suggested that the Federal Court determine the case on the Mississippi trial record is not, as the court properly states, a waiver of the claim to a right of full federal

---

**2.** The court reiterates this: "..... it is true that this specific case ought not to have reached the state court by way of abstention ...." [629 F.2d 1064]

**3.** The uncertainties and unknowns are highlighted in the court's note 10 which aptly describes what we now hold to be binding and beyond even superficial review as "an enigma cloaked in a mystery."

pretrial discovery and evidentiary submission. But by our ruling the keys lost much more than that. They lost the invaluable right to compel Judge Keady to determine, not only historical facts but the factual/legal significance of these facts without being hogtied by the fact findings of Mississippi Courts which we now mandate.

We must forget, as the court itself says, "[A]lthough this case involved a claim under state law, jurisdiction to decide it is exclusively federal". [629 F.2d 1062, 1062]

The right to a full Federal trial–free of any inhibitions or external restraints, with an appeal to this Court–compels acceptance–as *England* forbids–of a "state court determination, against a party's wishes, for his right to litigate his federal claims fully in the federal courts." 375 U.S. at 416–17, 84 S.Ct. at 466.

The Court adds to the riddle of the enigma wrapped in a mystery. It first stated:

The legal questions ... in this case—whether § 2409a applied to the state court action and whether the district court had the power to abstain–are both unsettled, and we express no view on how either question should be resolved. [629 F.2d 1060]

It posed the alternatives in this fashion: If it was beyond the district court's *power* to decline to exercise the jurisdiction Congress conferred exclusively on it, then the abstention order would be invalid as a judicial act going beyond the court's jurisdiction. It would seem to follow from that proposition that the abstention, if invalid, would not operate to lift the bar of exclusive in rem jurisdiction, and consequently that the state court could not properly take jurisdiction of the case. On

the other hand, if the district court had the power to abstain despite its exclusive jurisdiction, then, even if improper, the abstention was a valid judicial act. (emphasis in original) [629 F.2d 1060]

It seems to me the Court necessarily answers the unanswered, reserved query when it holds " ... that the judgment of the Mississippi Court as to jurisdiction is not subject to collateral attack on this appeal." [629 F.2d 1061]

And, unless the Court now means to make clear what it acknowledges is unclear[4] its action as to preclusion adds to the confusion. Since *Will v. Calvert Fire Ins. Co.*, 437 U.S. 655, 666, 98 S.Ct. 2552, 2559, 57 L.Ed.2d 504 (1978), expressly avoided the question whether a federal court "is without power to stay proceedings, in deference to a contemporaneous state action, where the federal courts have exclusive jurisdiction over the issue presented," *id.* at 666, 98 S.Ct. at 2565, I think the views of Mr. Justice Brennan (quoted extensively 629 F.2d 1062) should guide us here until the Supreme Court authoritatively answers the question.

One last comment. Our decision not only took away the Keys right to a trial in the Federal Court. In effect it takes away their right to a trial of *their* claim against the Wises–not just their right to defend the Wises' clear title claim–in any tribunal.[5]

\*     \*     \*     \*     \*     \*

The clear congressional policy of §§ 2409a and 1346(f) was to require Federal Court determination of any state–law based claim drawing in question continued ownership of the United States. That was the precise basis of the Keys claim. The validity of the Key's claim ousting the United States could not be determined except by trial–which

---

4. The court states:

Even though we have held that the state court judgment is not open to collateral attack, the preclusive effect of a state court determination on any aspect of a claim within the exclusive jurisdiction of the federal courts is unclear. *See, e.g.,* Note, *Res Judicata: Exclusive Federal Jurisdiction and the Effect of Prior State Court Determinations,* 53 Va.L.Rev. 1360 (1967). [629 F.2d 1062]

5. This predicament is fully discussed by the Court [629 F.2d 1057, 1058] and note 7: A State Court claim against the Wises (necessarily involving the United States easement) would trigger a removal to the Federal Court and an automatic dismissal for lack of State Court jurisdiction.

Congress ordained was to take place *exclusively* in the Federal Court.

Suppose the Mississippi Courts had ruled against the Wises. Does anyone think for a moment that the Federal Court would have been precluded, at least as to the Keys, by res judicata or, more likely, collateral estoppel? This would mean a second and superfluous trial where a single one would do.

Certainly Congressional policy ought not to be flouted by the sheer circumstance of how the case comes out. Exclusivity should be applied with an even hand.

I therefore respectfully dissent.